FILED
4/17/2019 8:14 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

CAUSE NO. CC-19-02325-A
_____

| | | |
|---|---|---|
| ANGELA POLLARD, | § | IN THE COUNTY COURT |
| | § | |
| | § | |
| PLAINTIFF, | § | |
| VS. | § | |
| | § | AT LAW NO. ____ |
| JONES LANG LASALLE AMERICAS, INC.; | § | |
| JONES LANG LASALLE SERVICES, INC.; | § | |
| JONES LANG LASALLE — TEXAS, INC.; | § | |
| AND JONES LANG LASALLE — | § | |
| CENTRAL TEXAS, LLC, | § | |
| | § | DALLAS COUNTY, TEXAS |
| DEFENDANTS. | § | |

## ANGELA POLLARD'S ORIGINAL PETITION

Why would a corporation known worldwide as a commercial property management expert let one of the buildings trusted to its care get sick and stay sick for years? Why would corporation like that let a building's inside environment stay toxic after the people working inside started getting sick? The building at issue put Angela Pollard in intensive care for conditions that have enduring medical consequences. Angela brings this lawsuit to get answers from the corporation that let her employer and its valued employees down.

This case is about corporate social responsibility and what it really means to a corporation using the import of healthy work environments as a cornerstone of its

**EXHIBIT A2**

marketing strategy. Who is the real Jones Lang LaSalle?[1] The face of corporate responsibility and environmental activism that it presents to the public? Or a corporation that knowing allowed a 7,550 square foot building to become increasingly toxic to its client's employees?

## INTRODUCTION

Corporations around the world pay Jones Lang LaSalle to manage their properties for them. Jones Lang LaSalle— JLL for short —is a global leader in the property management industry. Latest reports show JLL manages 4.6 billion square feet of facilities worldwide. Those properties include schools, stores, offices, banks, government buildings, hospitals, sporting facilities, hotels, warehouses, and industrial facilities. JLL's client list includes many of the biggest names in business.

JLL knows the difference between a healthy building and a sick building. It knows Sick-Building Syndrome hurts productivity and sick buildings really do make people sick. JLL knows keeping building environments healthy means keeping air clean and preventing indoor toxic mold. And it knows exactly what a property manager should do to stop or limit toxic mold when water gets inside a building. After all, Jones Lang LaSalle

---

[1] In this Petition, "Jones Lang LaSalle" as well as "JLL" refers to all four Defendants to this action: Jones Lang LaSalle Americas, Inc.; Jones Lang LaSalle Services, Inc.; Jones Lang LaSalle – Texas, Inc.; and Jones Lang LaSalle – Central Texas, LLC. These Defendants acted individually and in concert as described.

wrote about it in a book: [2]



Indeed, it would have been easy for JLL to do the right thing when water kept getting inside the Bank of America Bedford Branch on Central Drive. JLL's on the ground property management team knew about the odors, the leaks, the flooded vault rooms, the constant stains in the ceiling, water pooling under the building, carpet soaked in urine and feces from toilet overflow, air conditioning problems raising heat conditions and adding moisture too, bad air quality tests, and they knew the building had toxic mold. Most importantly, JLL knew people were getting sick because they worked in the bank. But JLL let these problems go for several years.

Maintaining, repairing, and monitoring the Bedford Bank Branch was Jones Lang LaSalle's responsibility. The conduct described below exemplifies a pattern of irresponsibility. A stark contrast to what this leading facility management corporation

---

[2] Simone Skopek & Bob Best, *Green + Productive Workplace: The Office of the Future . . . Today*, 202–04 (Jones Lang LaSalle Americas 2014); Jones Lang LaSalle UK, New Technology Brings Fresh Air to the Office, Aug. 10, 2017; Jones Lang LaSalle Inc., *Office checkup: 9 ways to make your space healthier*, (2017).

claims it is about:[3]

> *We are JLL.*
> *We take*
> *responsibility.*

Angela and several of her coworkers continue to pay the price of JLL's careless and indifferent treatment of their facility. Here is her story.

## FACTS

### A.   The Bank on Central Drive.

1.   WELCOME TO BANK OF AMERICA-BEDFORD CENTRAL DRIVE. Built in 1978, the single-story bank building measures 7,550 square feet. A traditional banking center and a Customer Preferred Sales Call Center operate on opposite sides of the building divided by tiled hallway connecting the front and back doors. Together those business provide jobs to thirty people, all of which work inside the facility. Bank of America refers to Bedford Central as a *high impact center*. Customer traffic inside the bank averages around 2,000 people each week. Here is a fair and accurate image of the bank from

---

[3] Jones Lang LaSalle Inc., 2013 Sustainability Report, Oct. 1, 2014, p. 1, from Jones Lang LaSalle Inc.'s investor relations website, accessed Nov. 20, 2018.

above:[4]



And this is what the bank was like when Angela worked inside . . .

2.      The unmistakable smell of mold hits you in the face as soon as you step through the door. And when you look up its easy to see brown stains on the ceiling tiles where the roof always leaks. Much worse, is the story told when you look down at the red-orange carpet under your feet. It's original to the building. It's fibers and splitting threads show more than the wear and tear of old age. You can't miss the water stains acquired from leaks and toilet floods or the mold.

3.      That's Bedford Central. The bank Angela Pollard managed between February 2016 and April 2018. The facility Bank of America trusted JLL to keep in good repair even before Angela got there. Ultimately, the facility's toxic environment forced Angela to transfer from Bedford Central because it continued to harm her health.

_____

[4] Google Satellite – 1904 Central Drive, Bedford, Texas.

**B.       The Roof– A History of Leaks Letting Water Penetrate the Bank.**

4.       Angela started working at the Bedford Bank in early 2016. City permit applications indicate the bank got a new roof sometime after October 2014. Shortly after, in late 2015, water got inside the bank due to the roof. That water caused the ceiling behind the teller line to collapse. A teller walking to the vault room slipped because the blue carpet she crossed was soaking wet. New ceiling tiles were installed but the blue carpet stayed. It was still in the bank when Angela left in April 2018.



5.       The roof continued leaking in 2016. Fire department inspectors noticed missing ceiling tiles in the janitor's closet and the electrical room in June 2016. According to the violation issued at the inspection, "ceiling/floor/penetrations" needed repaired:



6.      As roof leaks continued and ceiling tiles kept developing brown water stains, Angela submitted work tickets requesting repairs and tiles to replace those damaged by the leaks. She estimates placing 11-15 tickets using the MyFacility system that integrated JLL's facility management operations for all Bank of America facilities within JLL's responsibility.

7.      Roof leaks and water intrusions continued to plague the building during 2018. Angela submitted work tickets to JLL about roof leaks multiple times in February 2018. Finally, on March 5, 2018, the site requested an in-depth analysis of the roof's condition. However, leaks continued in the janitor's closet, above the safe box, and other known locations in the ceiling the rest of the month. Followed by leaks above the teller line as April 2018 began.

8.      Along with the roof leaks came water damage to walls, carpets, materials, and an unmistakable mold smell inside Bedford Central. Instead of trying to eliminate the overwhelming smell, JLL offered to send someone to cover it up. Instead of removing

those damaged materials, JLL had them air dried and left them in the bank. Every single time the carpets and walls got wet— from late 2015 through Angela's transfer in 2018— JLL had them dried (not sanitized) and left them in the bank. Roof leaks resulted in a hall wall retaining moisture to the point it was wet and spongy feeling.

9.      So, it should be no surprise that a March 2018 environmental atudy conducted by Amec Foster Wheeler found toxic mold colonies growing unchecked in the Vault, Back Executive Office, and near the Janitor's Closet (known for its long-time leak). Foster Wheeler's environmental study report instructed those rooms undergo mold remediation, carpet removal, and wall replacement. JLL received the report in March 2018.

10.     What remediation, if any, has taken place is unknown. Water stained ceiling tiles continued to appear in multiple locations during the summer months of 2018. The status of roof repairs, as of this filing, is also unknown.

**C.    More Sources Bringing More Water Inside the Bank.**

11.     Unfortunately, Bedford Central's water intrusion problems went beyond water leaking from the roof. Water got inside the building on a frequent basis through several other means. Rising water, broken seals and gaps around windows, HVAC condensation, and water pooled under the building.

12.     The bank vault—where Foster Wheeler discovered toxic mold growing— flooded four times while Angela worked at the bank. Heavy rains on January 18, 2017, drained

through an opening outside of the building causing water rising over the curb to get inside the vault room. On that occasion the water spread into the safety deposit box room and the teller area. Each time the vault flooded, JLL hired a vendor to extract the water. Finally, over a year later in March 2018, JLL extended the ends of several drains outside the building to stop them from draining into the walls and getting moisture into the vault room.

13.     The smell of toxic mold accompanied the floods. Bank employees submitted work requests asking JLL to fix ventilation inside the vault. On one occasion, JLL responded by bringing air freshener. In August 2017, the air quality and ventilation inside the vault disrupted a surprise vault audit. The auditor had to open the vault door less than an hour after the audit started because the air inside the vault made her too sick to continue inside the closed vault.

14.     As the pungent odor of toxic mold persisted occupants continued bringing the problem to JLL's attention. Eventually JLL found water pooled underneath the building from an unknown source. It took an entire night to drain the water sitting under the building. That didn't solve the problem. Instead, the water below the building kept coming back. It even came back when there wasn't any rain. That water not only exposed the unsealed foundation to moisture, it affected the air getting pumped into the building. An air handler underneath the building with that stagnant water had been sending stale air into the bank for occupants to breathe. Healthy buildings, according to JLL, position

air intakes away from locations with stagnant water.[5]

> Another consideration is the location of the air intakes, which should be as far as possible from known sources of pollution such as parking lots, the air exhausts from the building, drift from cooling towers, stagnant water or areas that have bird droppings.

15.     Poor ventilation, lack of fresh air, and a building containing growing colonies of toxic mold made Bedford Central's indoor environment dangerous.

**D.     Contaminated Water and the Carpet Stays . . .Twice.**

16.     JLL ignored this instruction from the Environmental Protection Agency[6] not once during Angela's time at Bedford Central, JLL ignored it twice.

> These guidelines are for damage caused by clean water. If you know or suspect that the water source is contaminated with sewage, or chemical or biological pollutants, then Personal Protective Equipment and containment are required by the Occupational Safety and Health Administration (OSHA). An experienced professional should be consulted if you and/or your remediators do not have expertise remediating in contaminated water situations. Do not use fans before determining that the water is clean or sanitary.

17.     Water contaminated with human urine and feces overflowed from the customer bathrooms and into the bank for the first time in April 2017. It happened when a toilet clogged by a foreign object overflowed underneath the bathroom tiles, through the wall to the other bathroom wall, and into the hallway.  JLL's response—send a third-party vendor in with fans, have the fans run a few days, and then clean the carpets. Meanwhile customers and employees walked up and down the hallway, tracking feces and urine throughout the entire building.

18.     Seven months later, in November 2017, it happened again. That time JLL hired a

---

[5] *Green + Productive Workplace: The Office of the Future . . . Today* at 203.
[6] EPA, *Mold Remediation in Schools and Commercial Buildings*, p. 11 (2008).

third-party vendor to dry the area with fans and those fans ran at least five days. The

carpet sat uncleaned for more than ten days. By that time, Angela was already in the ICU.

## E.   The Way Things Should Have Been Handled . . . According to JLL!

> " . . . MOLD. A UBIQUITOUS, INSIDIOUS, SILENT AND OFTEN INVISIBLE DANGER, MOLD REPRESENTS — QUITE LITERALLY — A GROWING MENACE THAT DISRUPTS AND DAMAGES WHATEVER IT TOUCHES."[7]

19.    PROPERTY MANAGERS—THE FIRST LINE OF DEFENSE AGAINST MOLD. John Craig,

then Senior Vice President in charge of Environmental Health and Safety Programs at

Jones Lang LaSalle, wrote that in June 2003. He made no attempt to hide his disdain for

personal injury lawsuits involving toxic mold— calling the litigation motivation enough

for property managers to take proactive measures against toxic mold. His advice:

> The reluctance to assume responsibility for treating mold problems may be less a reflection of the expense of the cure than an acknowledgment of the complexity and disruption of removal. Sources of mold accumulation can be elusive, and removing it can significantly disturb the workplace for occupiers. This also distinguishes mold from asbestos, which can most often be managed in place until removal is convenient. Evidence of mold growth is generally regarded as demanding an immediate response.

20.    More than fifteen years later, as a full-service, integrated facilities management

operation, JLL facility management professionals are still the first line of defense in the

fight against toxic mold. And they should be more equipped to fight menacing toxic mold

---

[7] June 2003, "The Growing Menace of Mold" by Jones Lang LaSalle Senior Vice President of Operations and Engineering, John Craig, www.hotel-online.com/News/PR2003_2nd/June03_MoldMenace.html (last accessed February 19, 2019).

today than ever before. Indoor environmental safety has become a central tenant of JLL's corporate persona. It devotes time and resources bringing awareness to the dangers for employees breathing polluted indoor air.[8]

> - **People impact:** Poor indoor air quality can cause sick building syndrome symptoms, such as asthma, allergies and bronchitis. It also contributes to higher rates of absenteeism and lower productivity.
> - **Bottom-line impact:** A 2008 study estimated the cost of indoor air pollutant damages to be upwards of $10 million in lost productivity, healthcare costs and building damages from moisture and mold. On the flip side, the savings and productivity gains of cleaner indoor air are estimated at $25 to $150 billion per year.

> **The problem with indoor air**
> While most people worry about the air out there – studies suggest that it's the air in here – in the office – that we should really be worrying about. Not only do we spend 90 percent of our time indoors, according to the EPA, the air inside can be two to five times more polluted than outside.

21.     JLL knows Sick-Building Syndrome isn't a myth. And it knows letting water intrusions persist, ignoring water damage, circulating contaminants into the air, and letting toxic mold colonies grow unchecked is not only wrong, or even negligent, it's downright dangerous.[9]

---

[8] Jones Lang LaSalle UK, "New Technology Brings Fresh Air to the Office" (Aug. 10, 2017); Jones Lang LaSalle Inc., "Office checkup: 9 ways to make your space healthier" (2017).
[9] *Green + Productive Workplace: The Office of the Future . . . Today* at 202–04.



**F.      Breathing Polluted Air for 8 Hours a Day, *Six* Days a Week, Did Exactly That.**

22.     Angela Pollard arrived at Bedford Central to take over as branch manager in February 2016. A former Marine, mother of one, and wife to her husband John, Angela was happy. She was also in the best shape of her life and had an active fitness regimen. Things changed the longer she worked at the bank. Angela did everything she could to keep JLL informed as all of these incidents arose. As the bank's manager, Angela advocated for herself and for her people. She tried to get responsible action from JLL.

23.     As a result of the toxic mold and dangerously poor air quality, Angela experienced chronic headaches, fatigue, memory problems, excessive sweating, constant thirst, frequent urination, insomnia, brain fog, joint pain, numbness, tingling, increased thirst, nausea, diarrhea, digestive issues, and depression. In November 2017, Angela's injuries from the toxic environment put her in intensive care.

24.     Angela isn't the same person she was when she arrived at the bank. The toxic mold and contaminants from the bank air invaded her body and the consequences of her toxic exposure persist today.

## Parties

25.    Defendant Jones Lang LaSalle Americas, Inc. is a foreign corporation with a principal place of business in Dallas County, Texas.  It may be served by serving its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

26.    Defendant Jones Lang LaSalle Services, Inc. is a foreign corporation with a principal place of business in Dallas County, Texas. It may be served by serving its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

27.    Defendant Jones Lang LaSalle – Texas, Inc. is a Texas for-profit corporation with its principal place of business in Texas. It may be served by serving its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

28.    Defendant Jones Lang LaSalle – Central Texas, LLC is a Texas for-profit corporation with its principal place of business in Texas. It may be served by serving its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

29.    Plaintiff Angela Pollard resides in Tarrant County, Texas. The last three digits of Angela Pollard's driver's license are 962.

## Discovery Control Plan

30.     Angela Pollard intends to conduct discovery under Level III of Texas Rule of Civil

Procedure 190.3.

## Jurisdiction and Venue

31.     Venue is proper in Dallas County pursuant to Texas Civil Practices & Remedies

Code § 15.002(a) because Jones Lang LaSalle, Inc. and Jones Lang LaSalle Services, Inc.

maintain principal offices in Dallas County in which decision makers control or direct

daily affairs in Texas.

32.     Venue is also proper in Dallas County pursuant to Texas Civil Practices & Remedies

Code § 15.002(a) because all or a substantial part of the events or omissions giving rise to

these claims occurred in Dallas County.

33.     This Court has jurisdiction because the amount in controversy exceeds the

minimum jurisdictional amounts of the Court.

## Causes of Action

**A.     Count One:   Jones Lang LaSalle's Negligence.**

34.     Angela Pollard's negligence claim is based on the facts set out in this Petition.

35.     At all relevant times, Jones Lang Lasalle exercised actual control in maintaining

the Bedford Bank Branch through its contractual arrangement with Bank of America and

through shared decision making in its role as facility manager for the bank. Each time

water intruded the bank, JLL handled the call. When water from overflowing toilets

flooded beyond tile floors onto carpets, JLL handled the call. Every time the roof leaked,

JLL handled the call. And when the odor of toxic mold became impossible to ignore, JLL told bank employees it was sending someone to mask the smell. When the Bedford Bank Branch had an issue, the process of deciding how to respond began, and often ended, with JLL. As facilities manager, JLL took part in decisions involving the Bedford Bank property.

36.     Likewise, JLL exercised actual control, by virtue of its contractual arrangement with Bank of America and through shared decision making in its role as facility manager for the bank, in deciding when to provide services through its own employees and when to hire third-party vendors. Sometimes the JLL decided which third-party vendor to hire. Other times advised about and shared vendor selection decisions with Bank of America.

37.     In so doing, Jones Lang Lasalle owed building occupants, including Angela Pollard, a duty to act as a reasonably prudent facilities manager and/or service provider would act in the similar circumstances. It was negligent in the following particulars:

    a)  Failing to act with ordinary care;

    b)  Failing to recognize the likelihood and appreciate the danger of toxic mold in the Bedford Bank Branch building;

    c)  Failing and refusing to address water penetration in the Bedford Bank Branch building;

    d)  Failing to develop and implement policies and procedures on how to respond to the presence of toxic mold in Angela's workplace;

    e)  Failing to ensure JLL employees and third-party vendors were trained on policies and procedures on how to recognize, appreciate, respond, and eradicate toxic mold in the Bedford Bank Branch;

f) Failing to ensure that all JLL employees and third-party vendors were trained on policies and procedures on how to recognize, appreciate, respond, and eliminate water intrusions in the Bedford Bank Branch;

g) Failing to notify the appropriate authorities and get qualified people to manage toxic mold discovered in the building;

h) Failing and refusing to address poor indoor air in the Bedford Bank Branch building;

i) Failing to develop and implement policies and procedures on how to respond to the presence of poor indoor air in Angela's workplace;

j) Failing to ensure JLL employees and third-party vendors were trained on policies and procedures on how to recognize, appreciate, respond, and eliminate poor indoor air in the Bedford Bank Branch;

k) Failing to notify the appropriate authorities and get qualified people to manage poor indoor air quality discovered in the building;

l) Failing to properly remediate the Bedford Bank Branch;

m) Failing to obtain a Certificate of Mold Damage Remediation;

n) Ignoring above-average illness reports from occupants in the building; and

o) Failing to protect Angela Pollard and her coworkers from foreseeable harms.

38. Jones Lang Lasalle's acts or omissions are a proximate cause of Angela's damages resulting from these events. Angela prays for and seeks all available damages as set forth below.

**B.   Count Two: Negligent Undertaking Per RESTATEMENT (Second) OF TORTS § 323.**

39. Angela Pollard's negligent undertaking claim is based on the facts set out in this Petition.

40.     JLL undertook, for pecuniary benefit, to control the methods, policies and procedures, and conditions of maintaining the Bedford Bank Branch property and thus assumed a duty, *inter alia*, to train, warn, and protect building occupants under the RESTATEMENT (Second) OF TORTS § 323.

41.     Further, JLL undertook, for pecuniary benefit, to control the response to the toxic mold infestation at the Bedford Bank Branch, including the development of policies and procedures, and thus assumed a duty, *inter alia*, to train, warn, and protect against the dangers of toxic mold under the RESTATEMENT (Second) OF TORTS § 323.

42.     Additionally, JLL undertook, for pecuniary benefit, to control the response to the poor air quality at the Bedford Bank Branch, including the development of policies and procedures, and thus assumed a duty, *inter alia*, to train, warn, and protect against the dangers of the bank building's air quality under the RESTATEMENT (Second) OF TORTS § 323.

43.     Having assumed those duties, JLL was negligent as set forth in the preceding count, including in failing to adequately protect, warn, and train building occupants against the dangers of that toxic mold.

44.     Having assumed those duties, JLL was negligent as set forth in the preceding count, including in failing to adequately protect, warn, and train building occupants against the dangers of poor air quality in their workplace.

45.     Angela suffered harm because of Jones Lang Lasalle's failure to exercise reasonable care in fulfilling those duties.

46.    JLL's failure to exercise reasonable care in fulfilling those duties increased the risk of harm to Angela, or in the alternative, Angela was harmed in reliance upon JLL's failure to warn her of dangers known to it.

47.    JLL's acts or omissions are a proximate cause of Angela's damages resulting from these events. Angela prays for and seeks all available damages as set forth below.

**C.    Count Three: Premises Liability.**

48.    Angela Pollard's premises liability claim is based on the facts set out in this Petition.

49.    At all times relevant hereto, JLL occupied, exercised control over, or had the right to control the Bedford Bank Branch premises at which Angela was injured. As such, JLL owed the highest duty of care to Angela as an invitee to warn her and protect her from the inherently dangerous conditions at the bank that existed because of the presence of highly toxic mold agents, poor air quality, and in the inadequacy of the safety measures in place to deal with those dangerous conditions.

50.    JLL knew or should have known of these dangers, the inadequacy of its responses and capabilities to protect occupants, such as Angela, all of which resulted in a dangerous condition for Angela. JLL, thus, should have either warned about or made safe the dangerous condition, including but not limited to:

   a)  Warning Angela that the air quality was inadequate;
   b)  Warning Angela the building contained toxic mold, the hazards associated with indoor toxic mold, or that the toxic mold was there to stay until it hired licensed professionals to remediate;

c) Refusing to eliminate all sources of water intrusion;

d) Refusing to eliminate the conditions causing poor indoor air quality;

e) Knowing the warning signs of indoor toxic mold, witnessing those signs a preposterous number of times, and actually finding viable, visible toxic mold colonies only to turn a blind eye;

f) Letting those toxic mold colonies continue to grow, water intrusion after water intrusion, flood after flood soaking the carpet in toilet water polluted by bacteria and human feces even after environmental experts told JLL to remediate;

g) Telling people who worked inside the bank the building was perfectly safe;

h) Instructing JLL-hired vendors to mask the unmistakable odor of toxic mold tainting the indoor air after knowing toxic mold colonies were there;

i) Smelling that odor firsthand through JLL employees on the ground but refusing to even attempt proper care; and

j) Being completely irresponsible with the environment hurting the building and occupants entrusted to JLL's care.

51. JLL negligently and grossly negligently failed to meet those duties even though it was foreseeable that the conditions posed such an extreme degree and unreasonable risk of harm to the people, like Angela, that worked inside the bank, and that failing to meet those duties would proximately cause damage to occupants like Angela.

52. JLL's acts or omissions are a proximate cause of Angela's damages resulting from these events. Angela prays for and seeks all available damages as set forth below.

**D.    Count Four: Jones Lang LaSalle's Gross Negligence.**

53. Angela Pollard's gross negligence claim is based on the facts set out in this Petition.

54. Angela avers that the conduct of JLL as set forth above constitutes gross negligence as the law defines those terms. JLL was consciously aware of an extreme

degree of risk to bank employees like Angela Pollard and those similarly situated, but it

nevertheless proceeded in failing to act to protect them in complete disregard for their

rights, safety, and welfare.

55.     For this gross negligence, Angela specifically pleads for the recovery of exemplary

damages as set forth below.

## AGENCY

56.     At all relevant times, the employees or agents of JLL whose conduct is implicated

were in the course and scope of their employment or acting as agents of JLL such that

JLL is liable for the conduct of those employees or agents.

## DAMAGES

**A.     Damages to Angela Pollard.**

57.     As a result of the of JLL's acts and omissions, Angela Pollard suffered through

severe physical, emotional, and economic injury and will likely suffer in the future such

injuries. For those reasons, Angela seeks damages, including, but not limited to the

following:

   a) Physical pain and mental anguish sustained in the past;
   b) Physical pain and mental anguish that, in reasonable probability, Angela will
      sustain in the future;
   c) Physical impairment sustained in the past;
   d) Physical impairment that, in reasonable probability, Angela will sustain in the
      future;
   e) Physical disfigurement sustained in the past;
   f) Physical disfigurement that, in reasonable probability, Angela will sustain in
      the future;

g)   Loss of enjoyment of life sustained in the past;

h)   Loss of enjoyment of life that, in reasonable probability, Angela will sustain in the future;

i)   Medical care expenses sustained in the past;

j)   Medical care expenses that, in reasonable probability, Angela will sustain in the future;

k)   Loss of earning capacity sustained in the past; and

l)   Loss of earning capacity that, in reasonable probability, Angela will sustain in the future.

58.   The above damages exceed the minimal jurisdiction of this Court, and Angela asks for full recovery of such damages following a trial by jury.

**B.   Exemplary Damages.**

59.   Angela alleges that each and every act or omission of JLL and its agents described in this Petition, when viewed objectively from the standpoint of policymakers, involved an extreme degree of risk, considering the probability and magnitude of the physical harm to others and that JLL had actual subjective awareness of the risks involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of Angela and other people working inside the Bedford Bank Branch. As such, JLL's conduct amounts to gross negligence or malice, as those terms are defined by law, so as to give rise to an award of exemplary or punitive damages, for which Angela now pleads against JLL. Further, by reason of such conduct, Angela is entitled to and therefore asserts a claim for punitive and exemplary damages in an amount sufficient to punish and deter JLL, and other corporate facility managers like JLL, from such conduct in the future.

60.   Additionally, each of the malicious and fraudulent acts of JLL independently give

rise to an award of exemplary or punitive damages, for which Angela now pleads against JLL in an amount sufficient to punish and deter JLL, and other corporate facility managers like JLL, from such conduct in the future.

## PRE-JUDGMENT AND POST-JUDGMENT INTEREST

61.    Angela Pollard requests pre-judgment and post-judgment interest in accordance with the maximum legal interest rates allowable as interpreted under the laws of the State of Texas.

## REQUEST FOR A JURY TRIAL

62.    Angela Pollard demands a jury trial on all issues so triable and contemporaneously with the filing of this Petition submits the applicable fee.

## REQUEST FOR DISCLOSURE

63.    Pursuant to TEXAS RULE OF CIVIL PROCEDURE 194, Angela Pollard asks Defendants disclose the information and material described in Rule 194.2. The written responses to requests for disclosure should conform to Rule 194.3 and all responsive materials, documents, and/or copies produced as Rule 194.4 instructs. The written responses, materials, and documents may be served by electronic service on Heather Lynn Long and Amy M. Carter of CARTER LONG PC and co-counsel Karen E. Ferris of FERRIS LAW.

## PRAYER

64.    Angela Pollard asks Jones Lang LaSalle Americas, Inc., Jones Lang LaSalle Services, Inc., Jones Lang LaSalle – Texas, Inc., and Jones Lang LaSalle – Central Texas, LLC are served with citation directing they appear and answer this Angela Pollard's

Petition and, when a final determination of these causes of action is made, Angela receive a judgment against these Defendants awarding Angela Pollard damages, costs of court, prejudgment and post-judgment interest, and all further relief to which Angela may be justly entitled.

Respectfully Submitted,

Heather Lynn Long
State Bar No. 14055865
heather@cltrial.com
Amy M. Carter
State Bar No. 24004580
amy@cltrial.com
CARTER LONG PC
4310 N. Central Expressway
Dallas, Texas 75206
Phone:  214-699-5994

Karen E. Ferris
State Bar No. 00790677
FERRIS LAW
karenferrislaw@gmail.com
5517 Fox Chase Lane
McKinney, Texas 75071
Phone:  214-500-2208

ATTORNEYS FOR ANGELA POLLARD

ORIGINAL PETITION